*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ROBERT EDWARD ZBIKOWSKI,

Defendant-Appellant.

UNPUBLISHED
July 20, 2026
2:34 PM

No. 372213
Macomb Circuit Court
LC No. 2022-000306-FC

Before: MALDONADO, P.J., and RIORDAN and YOUNG, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of second-degree murder, MCL 750.317, and operating a motor vehicle while intoxicated (OWI) causing death, MCL 257.625(4). We affirm.

## I. BACKGROUND

This case arises out of the tragic death of a young man, PK, in a traffic collision. On the morning of the collision, PK was driving to his summer job at Kroger in his 1999 BMW. Defendant was leaving work at a plant located in Sterling Heights, traveling northbound on Van Dyke Avenue in his Dodge Durango. The speed limit on this stretch of Van Dyke is 45 miles per hour, but when defendant approached the intersection of Van Dyke and 18 Mile Road, he was traveling 61 miles per hour. Video evidence from a nearby bank showed that the traffic light turned red approximately 13 seconds before defendant reached the intersection. Instead of slowing down, defendant pushed the accelerator pedal all the way to the floor, which increased the speed of his Durango to 73 miles per hour. Defendant never pressed the brake pedal.

When defendant's Durango reached the intersection, it collided with the driver's side of PK's BMW. The vehicles collided with such force that an observer heard the crash nearly a mile away. The damage to PK's BMW was catastrophic, and PK died before police officers arrived at the scene shortly after the collision. Officers Anthony Jantz and Brendan Harrison of the Sterling Heights Police Department were the first officers to arrive at the scene. When Officer Harrison interacted with defendant, he observed that defendant was slurring his speech and his eyes appeared watery and bloodshot. After defendant exited the Durango, Officer Harrison smelled the

odor of intoxicants emanating from the vehicle. He also noticed that there were two partially consumed bottles of vodka inside of the Durango. Suspecting that alcohol could have been a factor in the crash, Officer Harrison prepared a search warrant for a blood draw.

Meanwhile, Officer Jantz accompanied defendant to the hospital. Defendant admitted to Officer Jantz that "he was having some issues drinking alcohol." A nurse who treated defendant at the hospital also believed that he was intoxicated because of his demeanor. Later, Officer Harrison arrived at the hospital with a signed warrant for a blood draw. Defendant's blood was drawn approximately two hours and twenty minutes after the collision. Defendant's blood alcohol content was 0.185 grams of ethanol per 100 millimeters of blood, i.e., more than twice the legal limit for drivers in Michigan.[1]

Defendant was charged with second-degree murder and OWI causing death. The case was tried in front of a jury over several days. The prosecution presented the testimony of several officers who responded to the scene of the accident or were involved in the investigation. Sergeant Chad Lindstrom, an accident reconstruction specialist, testified regarding his analysis of the "black box" data from defendant's Durango, which showed defendant's speed and acceleration in the moments before the crash.

Jordyn Geiger, the laboratory technician who authored the report on defendant's blood sample testified, and during her testimony, she revealed that another employee, Tabitha Faust, had actually tested defendant's blood. Defendant objected to the admission of Geiger's report because there was a break in the chain of custody. The trial court ultimately overruled the objection and admitted the report. After Geiger's testimony, the prosecution amended its witness list to add Faust, who was not previously endorsed as a witness. The prosecutor argued there was good cause to permit the amendment because Faust had not previously been disclosed by Geiger. The trial court permitted the amendment over defendant's objection but granted defendant a two-day continuance to investigate Faust before her testimony. Later in the trial, Faust testified about her role in analyzing defendant's blood.

After the prosecution rested, outside of the presence of the jury, defendant moved for a directed verdict. First, defendant argued that the prosecution failed to present any evidence that would be indicative of malice, which is a required element of a second-degree murder conviction. After argument on the record from both sides, the trial court denied the motion. Second, defendant argued that the prosecution did not meet its burden of demonstrating that defendant's blood alcohol content was over the legal limit because Michigan law requires a blood draw to be performed under the delegation of a licensed physician. Defendant argued that because a doctor was not supervising the nurse when she drew defendant's blood, the results of the test were inadmissible. The trial court denied this motion as well.

The jury then found defendant guilty of second-degree murder and OWI. This appeal followed.

---

[1] The unlawful blood alcohol content level is 0.08. MCL 257.625(1)(b).

## II. MOTION FOR A DIRECTED VERDICT

Defendant contends that the trial court erred when it denied his motion for a directed verdict because there was insufficient evidence of malice and the blood draw evidence that established defendant's blood alcohol content was inadmissible. We disagree.

### A. STANDARD OF REVIEW

We review de novo whether the trial court erred when it denied a motion for directed verdict. *People v Aldrich*, 246 Mich App 101, 122; 631 NW2d 67 (2001). In other words, we apply the same standard in reviewing the trial court's ruling on a motion for directed verdict as the trial court applies at the time the motion was made. *People v Schultz*, 246 Mich App 695, 702; 635 NW2d 491 (2001). "In ruling on a motion for a directed verdict, the trial court must consider in the light most favorable to the prosecutor the evidence presented by the prosecutor up to the time the motion is made and determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *Id*. Circumstantial evidence and the reasonable inferences drawn therefrom can be sufficient to establish the elements of a crime. *Id*. All conflicts must be resolved in favor of the prosecution. *People v Haynes*, 338 Mich App 392, 417; 980 NW2d 66 (2021).

### B. EVIDENCE OF MALICE

Defendant first contends that the trial court erred in denying his motion for a directed verdict on the second-degree murder charge because there was insufficient evidence to support a jury's determination that defendant acted with the requisite malice.

The elements of second-degree murder are: "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse."[2] *People v Gafken*, 510 Mich 503, 511; 990 NW2d 826 (2022) (quotation marks and citation omitted). Malice may be proven in three ways: "by showing (1) the intent to kill, (2) the intent to cause great bodily harm, or (3) the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id*. The third theory for proving malice has also been articulated as "the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result." *Id*. (quotation marks and citation omitted). Under this theory, "[m]alice may be inferred from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *People v Bailey*, 330 Mich App 41, 48; 944 NW2d 370 (2019) (quotation marks and citation omitted). Implying malice requires "egregious circumstances." *People v Goecke*, 457 Mich 442, 467; 579 NW2d 868 (1998).

In the drunk-driving context, not every accident caused by a drunk driver which results in death will support a second-degree murder charge. *Id*. at 468. Rather, to submit a case for trial on

---

[2] In *People v Spears*, 346 Mich App 494, 517; 13 NW3d 20 (2023), this Court concluded that "the often-recited fourth element of second-degree murder, 'without justification or excuse,' actually is part of the 'cluster of ideas' of second-degree murder" and is not an element of the offense.

second-degree murder, the case must "involve a level of misconduct that goes beyond that of drunk driving." *Id.* See also *People v Werner*, 254 Mich App 528, 533; 659 NW2d 688 (2002). Although there is no set list of factors for determining whether an intoxicated driver who caused a traffic fatality acted with malice, in *Goecke*, the Michigan Supreme Court found that evidence of traffic violations, speeding, minor and near collisions, and erratic driving were important considerations. See *Goecke*, 457 Mich at 470-473.

In the present case, when the evidence is examined in the light most favorable to the prosecution, the evidence of malice was sufficient for a jury to find that the element was proven beyond a reasonable doubt. See *Aldrich*, 246 Mich App at 122. This case is factually similar to a case consolidated with *Goecke*, wherein the Court held that the defendant's intoxication of 0.18 nearly three hours after the accident, his familiarity with the area where the crash took place, his decision to travel at nearly double the posted speed limit, and his failure to stop at a red stoplight, was sufficient for a reasonable jury to infer malice. See *Goecke*, 457 Mich at 450-451, 471-472.

Similarly, here, defendant's blood alcohol content was measured at 0.185 approximately 2 hours and 20 minutes after the fatal collision that took PK's life. This is more than twice the legal limit in Michigan. Officer Jantz, who was with defendant nearly the entire time after the collision to the time when his blood was drawn, did not observe defendant eat or drink anything. Consequently, the jury could reasonably infer that defendant's blood alcohol content was at least 0.185 at the time of the collision and may have even been higher. See *Schultz*, 246 Mich App at 702.

Also, defendant was traveling well in excess of the posted speed limit at the time of the collision. Five seconds before the accident, defendant was traveling 61 miles per hour. Then at 3.4 seconds before the accident, defendant floored the gas pedal, bringing his speed to 73 miles per hour immediately before the accident. The speed limit was 45 miles per hour. Under *Goecke*, this excessive speed was a factor that the trial court was permitted to consider when weighing whether the evidence of malice was sufficient to withstand defendant's motion for a directed verdict.

Most critically, however, was the evidence of defendant's failure to stop at the red light before the crash. Video evidence showed that the stoplight had been red for approximately 13 seconds before defendant reached the intersection. Based on defendant's recorded speeds, defendant would have had about 1,200 feet, or four football fields, to stop before reaching the intersection. Indeed, a witness, William Gould, saw defendant nearly a quarter of a mile from the intersection and observed that he was driving very fast. Despite having 13 seconds and 1,200 feet to safely come to a stop at the intersection, defendant never pressed the brake pedal. Instead, he accelerated, forcing Gould to come to a complete stop in the middle of the intersection to avoid being hit by defendant.

This evidence, when viewed in the light most favorable to the prosecution, was sufficient for the jury to "reasonably infer that the defendant placed himself in a position the results of which a reasonable person would know had the natural tendency to cause death or great bodily harm." *Goecke*, 457 Mich at 471-472. Traveling at a high rate of speed through an intersection long after the light turned red when there was at least one other car visibly attempting to cross the intersection showed a wanton and willful disregard for human life under the standard in *Goecke*. *Id*. at 470.

Consequently, the trial court did not err when it concluded that defendant's conduct exceeded that of mere drunk driving, and a rational jury could conclude that defendant acted with malice.

In addition, defendant argues that the evidence of malice was insufficient because it did not demonstrate that he was *subjectively* aware of the risk his behavior created. Second-degree murder is a general intent crime, and malice may be implied when "the defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with wanton disregard for human life." *Id*. at 467 (quotation marks and citation omitted). Further, this Court noted that a "highly unusual case" might "require a determination of the issue whether the defendant was subjectively aware of the risk created by his conduct." *Id*. at 464. However, "an advanced state of voluntary intoxication is not sufficient to qualify as the sort of 'unusual case' that requires a subjective determination of awareness under *Goecke*." *Werner*, 254 Mich App at 533. Defendant has not demonstrated that he was "more absent-minded. . . than the reasonable man" such that an inquiry into his subjective mental state would have been warranted. *Goecke*, 457 Mich at 465 n 25. Therefore, the evidence, when viewed in the light most favorable to the prosecution, was sufficient to establish that "defendant placed himself in a position the results of which a *reasonable person would know* had the natural tendency to cause death or great bodily harm." *Id*. at 471-472 (emphasis added). Accordingly, defendant has not demonstrated that the trial court erred when it denied his motion for a directed verdict.

## C. BLOOD ALCOHOL EVIDENCE

Next, defendant argues that the trial court erred by denying his motion for a directed verdict of acquittal because his blood was drawn in violation of MCL 257.625a(6)(c) and without the blood alcohol evidence, the prosecutor would have been unable to sustain its burden of proving that defendant was driving while intoxicated.

As an initial matter, defendant presented his argument about the problems with the blood-draw evidence for the first time in his motion for a directed verdict following the close of the prosecution's case. "A directed verdict of acquittal is appropriate only if, considering all the evidence in the light most favorable to the prosecution, no rational trier of fact could find that the essential elements of the crime charged were proven beyond a reasonable doubt." *People v Mehall*, 454 Mich 1, 6; 557 NW2d 110 (1997). When ruling on a motion for a directed verdict of acquittal, the trial court must view the prosecution's evidence *admitted up to the time the motion was made* in the light most favorable to the prosecution. *People v Vincent*, 455 Mich 110, 121; 565 NW2d 629 (1997). A motion for a directed verdict is not the correct procedural vehicle to challenge the admissibility of evidence. Rather, the trial court looks at the sum of the evidence admitted during trial and determines whether it is sufficient to send a particular charge to the jury. *Id*.

Here, defendant was effectively asking the trial court to ignore evidence that was admitted at trial. However, the trial court's role in deciding a motion for a directed verdict is to consider *all evidence* admitted up to the time of the motion in the light most favorable to the prosecution. *Mehall*, 454 Mich at 6. Under this standard, the trial court was required to examine whether the prosecution established its case, not whether evidence was wrongly admitted. The trial court did not err by refusing to deviate from this mandate and instead decide the issue of the admissibility of the blood draw evidence that was admitted during the trial on the basis of an objection that was never raised. Because a motion for a directed verdict was not the correct procedural vehicle for

challenging the admissibility of the evidence, defendant cannot demonstrate that the trial court erred by failing to do so. We, therefore, need not delve into the substance of defendant's argument because the argument, on its face, lacks merit.

## III. UNENDORSED WITNESS

Defendant also argues that the trial court erred by permitting Faust to testify despite the prosecutor's failure to demonstrate that there was good cause to add her to the endorsed witness list after the deadline to do so passed. We disagree.

We review a trial court's decision to permit or deny the late endorsement of a witness for an abuse of discretion. *People v Yost*, 278 Mich App 341, 379; 749 NW2d 753 (2008). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *Id*.

"A prosecutor's late endorsement of a witness is permitted at any time upon leave of the trial court and for good cause shown." *People v Canter*, 197 Mich App 550, 563; 496 NW2d 336 (1992). Under MCL 767.40a, the prosecutor's duty is to "provide notice of known witnesses and reasonable assistance to locate witnesses on a defendant's request." *People v Gadomski*, 232 Mich App 24, 36; 592 NW2d 75 (1998). "There is no requirement to exercise due diligence to discover the names of witnesses." *Id*. Accordingly, late discovery, or identification of a witness may constitute good cause to add to the list of endorsed witnesses. *Id*. "Mere negligence of the prosecutor is not the type of egregious case for which the extreme sanction of precluding relevant evidence is reserved." *People v Callon*, 256 Mich App 312, 328; 662 NW2d 501 (2003). "Moreover, to establish that the trial court abused its discretion, [a] defendant must demonstrate that the court's ruling resulted in prejudice." *Id*.

In the present case, the trial court did not abuse its discretion by finding there was good cause to allow the prosecutor to add Faust to the witness list. The trial court found that the prosecution's failure to include Faust was not intentional or the result of bad faith. We agree.

The trial court's decision was consistent with this Court's precedents, holding that the discovery or identification of a witness during trial constitutes good cause for a late endorsement. See *Canter*, 197 Mich App at 563. In the present case, the prosecutor was not aware that Faust tested defendant's blood until Geiger testified at trial. Geiger was an endorsed witness who authored the written report analyzing defendant's blood alcohol content. During Geiger's testimony, she revealed that Faust physically tested defendant's blood. Faust's name was not included in the lab reports and Geiger had not mentioned Faust's involvement in the case when speaking with the prosecutor before trial.

Additionally, although it is true that the addition of Faust as a witness was late under the disclosure requirements of MCL 767.40a, a trial court has discretion to fashion a remedy for disclosure violations that balances the competing interests of both parties. Trial courts have inherent discretion to manage discovery "to promote the fullest possible presentation of the facts, minimize the opportunities for falsification of evidence, and eliminate the vestiges of trial by combat." *People v Taylor*, 159 Mich App 468, 483-484; 406 NW2d 859 (1987). A continuance may be used as a remedy "to allow the opportunity to investigate tardily disclosed evidence"

because "it serves the greater public interest of insuring that the trial, when concluded, will not be skewed by the exclusion of trustworthy evidence." *Id.* at 484. When the prosecution moved the trial court to add Faust as a witness and defense counsel stated she would need "a few days" to investigate Faust, the trial court provided defendant two days to conduct a background investigation. Defense counsel told the trial court that two days would be acceptable and provided no further objections when Faust was called to testify. Accordingly, defendant has not demonstrated that the trial court abused its discretion when it permitted Faust's testimony after providing defendant the necessary time to prepare for her testimony.

Lastly, defendant cannot "demonstrate that the court's ruling resulted in prejudice." *Callon*, 256 Mich App at 328. In the present case, defendant knew that there would be testimony about the testing and analysis of the blood alcohol content of his blood sample, but defendant expected this testimony to come solely from Geiger. The addition of Faust as a witness did not result in prejudice because "[w]hile the source of the testimony may have been a surprise, the contents were not." *People v Herndon*, 246 Mich App 371, 403; 633 NW2d 376 (2001). Further, the trial court alleviated any prejudice by allowing defendant the opportunity to investigate before Faust's testimony. Accordingly, defendant cannot demonstrate prejudice from the late addition of this witness, and he is not entitled to relief on this basis. *Id.*

## IV. JUDICIAL BIAS

Finally, defendant argues that the trial court's improper conduct and judicial bias deprived him of a fair trial. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Defendant did not raise a claim of judicial bias in the trial court; accordingly, the argument is not preserved. *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011). We review unpreserved claims of judicial bias for plain error affecting substantial rights. *Id.*

"To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.* However, when a forfeited error is "structural," "the existence of a forfeited structural error alone satisfies the third prong of the plain-error standard, and a defendant need not also show the occurrence of outcome-determinative prejudice." *People v Davis*, 509 Mich 52, 74; 983 NW2d 325 (2022); see also *People v Plomb*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 368608); slip op at 10.

Finally, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Carines*, 460 Mich at 763 (quotation marks and citation omitted). "The formal rebuttable presumption in cases of forfeited structural error will shift the burden to the prosecutor to demonstrate that the error did not seriously affect the fairness, integrity, or public reputation of the judicial proceeding." *Davis*, 509 Mich at 76.

## B. TEST FOR JUDICIAL BIAS AND MISCONDUCT

"A trial judge has broad, but not unlimited, discretion when controlling the court's proceedings." *People v Boshell*, 337 Mich App 322, 347; 975 NW2d 72 (2021). A trial court's actions may not "pierce the veil of judicial impartiality." *Id*. at 348. One way in which a court may violate this tenet is by invading the prosecutor's role. *Id*. Although a court may question a witness to clarify or elicit additional testimony under MRE 614(b), the trial court must "exercise caution and restraint to ensure that its questions are not intimidating, argumentative, prejudicial, unfair, or partial." *Id*. (quotation marks and citation omitted). The test to determine whether a trial court's handling of the trial pierces the veil of impartiality is whether, "considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *People v Stevens*, 498 Mich 162, 171; 869 NW2d 233 (2015). This is a "fact-specific inquiry, and this Court considers the cumulative effect of any errors." *People v Willis*, 322 Mich App 579, 588; 914 NW2d 384 (2018) (quotation marks and citation omitted). However, a defendant alleging judicial bias "must overcome a heavy presumption of judicial impartiality." *Id*.

To determine whether the trial court pierced the veil of judicial impartiality, we must consider a variety of factors, including:

> [1] the nature of the judicial conduct, [2] the tone and demeanor of the trial judge, [3] the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, [4] the extent to which the judge's conduct was directed at one side more than the other, and [5] the presence of any curative instructions. [*Stevens*, 498 Mich at 172.]

## 1. THE NATURE OF THE CONDUCT

"Judicial misconduct may come in myriad forms, including belittling of counsel, inappropriate questioning of witnesses, providing improper strategic advice to a particular side, biased commentary in front of the jury, or a variety of other inappropriate actions." *Id*. at 172-173. Here, defendant alleges that the trial court improperly questioned Officer Geldmacher about whether he smelled an odor of intoxicants from defendant's vehicle.

"[W]hen evaluating a judge's questioning of witnesses, a reviewing court must first bear in mind that such interrogation is generally appropriate under MRE 614(b)." *Id*. at 173. However, "the central object of judicial questioning should be to clarify." *Id*. In other words, the judge should not invade the role of the prosecutor or "exhibit disbelief of a witness, intentionally or unintentionally." *Id*. at 174, 184.

Defendant has not demonstrated that the trial court's questions to Officer Geldmacher exceeded the bounds of what is permissible. Under the plain-error test that applies to this issue, defendant must show that an error occurred, and the error "was plain, i.e., clear or obvious." *Carines*, 460 Mich at 763. "[I]t is appropriate for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information." *Stevens*, 498 Mich at 173. Here, Officer Geldmacher was dispatched to the scene of the accident to photograph defendant's vehicle at 6:30 a.m., i.e., shortly after the accident took place. Consequently, his observations of

the vehicle shortly after the accident, specifically any odor of alcohol coming from the vehicle, were relevant because defendant's intoxication was key to both charges. Therefore, defendant fails to establish that the trial court's question on this point went beyond the bounds of permissible questioning under MRE 614(b).

Next, defendant argues that the trial court provided improper strategic advice to the prosecution when it instructed the prosecution to "come up with a plan" to deal with the chain-of-custody issues raised by defense counsel. On this record, defendant has not established that the trial court improperly advised the prosecution regarding trial strategy. The trial court's statement did not direct the prosecution to follow a specific course of action. See *Plomb*, ___ Mich App at ___; slip op at 8. Rather, it appears that the trial court's statement was borne out of the trial court's legitimate goals of managing the trial and determining the best way to move forward in light of defendant's chain-of-custody objection. Accordingly, defendant has not demonstrated that the trial court clearly erred when it instructed the prosecutor to come up with a plan to respond to defendant's chain-of-custody objection but did not direct the prosecution to follow a specific course of action or otherwise give the prosecution strategic advice.

Finally, respondent argues, without citation to the record, that the trial court presented arguments on behalf of the prosecution before allowing the prosecution to respond directly during defense counsel's motion for a directed verdict. It is true that the trial court interjected during defendant's arguments regarding the motion for directed verdict, but there is no rule against doing so and this was not the first time the trial court heard defendant's legal arguments on this point. Defendant moved to quash the bindover from the district court, essentially raising the same legal argument that he made during his motion for a directed verdict, i.e., that the evidence of malice was insufficient to support a charge of second-degree murder. After oral arguments from both sides, the trial court denied the motion to quash. Consequently, this was not an issue of first impression for the trial court because the judge had already evaluated and rejected defendant's arguments.

"Where a judge forms opinions during the course of the trial process on the basis of facts introduced or events that occur during the proceedings, such opinions do not constitute bias or partiality unless there is a deep-seated favoritism or antagonism such that the exercise of fair judgment is impossible." *People v Wells*, 238 Mich App 383, 391; 605 NW2d 374 (1999). Here, the record reflects that the trial court judge was properly exercising his role in deciding legal issues when he questioned defendant about the legal merits of defendant's motion for a directed verdict. Accordingly, defendant has not demonstrated plain error under *Carines*.[3]

---

[3] Defendant makes other references to judicial bias; however, defendant neither provides citations to the record, nor clarifies how the judicial actions were impermissible under Michigan law. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Iannucci*, 314 Mich App 542, 545; 887 NW2d 817 (2016) (quotation marks and citation omitted). "The failure to brief the merits of an allegation of error constitutes an abandonment of the issue." *Id*. (quotation marks and citation omitted).

## 2. TONE AND DEMEANOR OF THE JUDGE

"To ensure an appearance of impartiality, a judge should not only be mindful of the substance of [their] words, but also the manner in which they are said." *Stevens*, 498 Mich at 175. Although "appellate courts typically do not have the benefit of viewing a trial judge's tone and demeanor first hand," there are circumstances in which "the very nature of the words used by the judge can exhibit hostility, bias, or incredulity." *Id*. at 176.

Here, the record does not reflect that the judge exhibited a tone or demeanor that was biased against defendant. The judge's questions to Officer Geldmacher reflected a desire to elicit additional relevant testimony and did not appear to be designed to be "argumentative, [reflect] skepticism, and [undermine] the witness's credibility." *People v Swilley*, 504 Mich 350, 379; 934 NW2d 771 (2019). Additionally, although it is impossible to determine the judge's tone when he instructed the prosecutor to "come up with a plan" to deal with the chain-of-custody objection, the comment, which was made outside of the presence of the jury, seemed to reflect the judge's annoyance *at the prosecution* for failing to anticipate the issue and prepare his witness list accordingly. Finally, the judge's statements during defendant's motion for a directed verdict, again outside of the presence of the jury, did not reveal hostility toward defendant but rather skepticism of the legal position he was putting forward, which the trial court had previously rejected. Accordingly, defendant has not demonstrated that the judge's tone or demeanor reflected an improper bias against defendant.

## 3. SCOPE AND DIRECTION OF THE INTERVENTION

Next, we must "consider the scope of judicial intervention within the context of the length and complexity of the trial, or any given issue therein." *Id*. at 386 (quotation marks and citation omitted). Closely related to scope is the direction of the judicial intervention which requires us to consider "the extent to which a judge's comments or questions were directed at one side more than the other." *Stevens*, 498 Mich at 176-177. "Judicial partiality may be exhibited when an imbalance occurs with respect to either the frequency of the intervention or the manner of the conduct." *Id*. at 177.

Here, defendant objects to two questions posed by the judge to Officer Geldmacher over a six-day trial. This is a far cry from the cases in which a reviewing court has held that extensive judicial questioning was problematic. See *People v Cole*, 349 Mich 175, 187; 84 NW2d 711 (1957). Consequently, defendant has not demonstrated that the scope of the trial court's involvement in questioning witnesses was problematic.

Defendant has also not demonstrated that the trial court's involvement during the trial was only intended to benefit the prosecution. Although defendant argues that the judge offered the prosecution strategic advice by telling him to come up with a plan to deal with the chain-of-custody issue, the trial court also offered defendant legal advice when defendant indicated that he would be calling his wife as a witness. Consequently, if the trial court did improperly give the parties

---

Consequently, any further argument on this issue is abandoned, and we will not address it. *People v Payne*, 285 Mich App 181, 195; 774 NW2d 714 (2009).

legal advice, the assistance was not one-sided because defendant also benefited from the trial court's insight.

Finally, during the arguments on defendant's motion for a directed verdict, although the trial court interrupted defense counsel's arguments with a number of questions, the questions were not indicative of bias because they were rooted in the trial court's skepticism about the legal basis for the arguments and not "deep-seated favoritism or antagonism such that the exercise of fair judgment is impossible." *Wells*, 238 Mich App at 391. Defendant has not shown that the scope or direction of the trial court's intervention during his trial demonstrated an impermissible judicial bias.

## 4. CURATIVE INSTRUCTIONS

"Lastly, the presence or absence of a curative instruction is a factor in determining whether a court displayed the appearance of advocacy or partiality." *Stevens*, 498 Mich at 177. "[A] curative instruction will often ensure a fair trial despite minor or brief inappropriate conduct" because jurors are presumed to follow their instructions. *Id*. Here, the judge instructed the jury that his comments and questions did not constitute evidence. As a result, this factor also weighs in favor of a finding that the judge did not pierce the veil of judicial impartiality.

## C. PLAIN ERROR

Looking at the factors from *Stevens* as a whole, we are not persuaded that the trial court pierced the veil of impartiality so as to improperly deny defendant a fair trial. As noted above, to be entitled to relief on this unpreserved issue, defendant must demonstrate that the error occurred and it was plain, i.e., clear or obvious. *Carines*, 460 Mich at 763. None of the errors alleged, either individually, or as a whole, clearly demonstrated the appearance of advocacy or partiality by the trial court judge. Nor did defendant overcome the heavy presumption of impartiality and demonstrate that the trial court's involvement unfairly influenced the jury. On this record, defendant has not established that he is entitled to relief.

Affirmed.

/s/ Allie Greenleaf Maldonado
/s/ Michael J. Riordan
/s/ Adrienne N. Young

-11-